**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| | : | |
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 |
| | : | (MJD/SRN) |
| This Document Relates to: | : | |
| | : | |
| *James A. Thompson v. Bayer Corp., et al.* | : | Case No. 02-0163 |
| | : | |

## DEFENDANTS BAYER AND GSK'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff James Thompson claims to have suffered a variety of aches and pains because of Baycol. None of his physicians agrees, including Mr. Thompson's case-specific expert, who has recanted his original opinion in support of Mr. Thompson's claim. Because those claims are not supported by expert medical opinion, summary judgment should be entered in favor of defendants and against Mr. Thompson.[1]

## FACTS

Mr. Thompson is a laborer with a history of cardiac problems. On October 9, 2000, Mr. Thompson's lipid tests measured total cholesterol of 298 and triglycerides of 548. Deposition of Dr. Randy Daigle (Ex. A) at 48:3-7. LDL cholesterol (the "bad" cholesterol) could not be measured precisely because Mr. Thompson's triglyceride levels were too high, but LDL cholesterol was approximated at 248 or 250, double the recommended level. *Id.* at 48:8-49:13. In an effort to reduce these levels,

[1] Mr. Thompson's complaint was originally filed as a putative class action. *See* Complaint ¶¶ 2, 27. During his deposition, however, Mr. Thompson expressed his desire to discontinue the class action aspect of this case and to pursue his claim as an individual only. *See* Deposition of James Thompson (Ex. B) at 236:10-237:3.

Mr. Thompson's doctor recommended a low-cholesterol diet. *Id.* at 50:12-25. Four months later, on February 2, 2001, a follow-up lipid panel revealed total cholesterol of 272 and triglycerides of 342 – still too high. *Id.* at 51:1-7. Dr. Daigle therefore prescribed Baycol. *Id.* at 51:8-11.

Mr. Thompson now claims that within weeks of starting Baycol, he began to experience a variety of side effects including muscle aches and stiffness, muscle weakness and tenderness, fatigue, dark urine, nausea and vomiting, and other aches and pains. Deposition of James Thompson (Ex. B) at 136:18-138:1. But Mr. Thompson never complained of these ailments to Dr. Daigle. Daigle Dep. (Ex. A) at 54:3-22. Mr. Thompson left Dr. Daigle's care in April 2001 (*id.* at 52:15-54:2) because, according to Mr. Thompson, the doctor could not diagnose his purported ailments. Thompson Dep. (Ex. B) at 146:7-20. However, Dr. Daigle testified that Mr. Thompson stopped seeing him because the doctor would not prescribe Xanax (an anti-anxiety drug similar to Valium) without having the opportunity to evaluate Mr. Thomspon. Daigle Dep. (Ex. A) at 53:15-19.

Three months later, Mr. Thompson presented to Dr. Mark St. Cyr complaining of high blood pressure, tension, elevated cholesterol, and pain in his elbow and shoulder. Deposition of Dr. Mark St. Cyr (Ex. C) at 34:12-17. Because Mr. Thompson was taking a statin, Dr. St. Cyr ordered a liver enzyme test. *Id.* at 37:20-25. Mr. Thompson failed to return for the test. *Id.* at 38:1-14. Mr. Thompson next saw Dr. St. Cyr on September 5, 2001, complaining of pain in his elbows, chest, neck, and lower

back and asking for a change in his cholesterol-lowering medication, since he knew Baycol had been withdrawn from the market. *Id.* at 49:12-20.

Approximately one year after ceasing treatment with Dr. St. Cyr, Mr. Thompson was referred by his attorneys to Dr. Fernando Alemany in June 2003 to obtain an expert opinion in this litigation. Deposition of Dr. Fernando Alemany (Ex. D) at 11:3-12:3; 48:15-49:4. Dr. Alemany diagnosed Mr. Thompson as having experienced myalgia and rhabdomyolysis as a result of taking Baycol. Case Specific Expert Report Pursuant to PTO 114 (Ex. E) ¶ 5. However, at that time, Dr. Alemany did not review medical records created before Mr. Thompson discontinued Baycol use. Alemany Dep. (Ex. D) at 58:13-60:5.

Mr. Thompson has continued to see Dr. Alemany periodically ever since. *See, e.g.*, Thompson Dep. (Ex. B) at 243:5-8 (stating that he still sees Dr. Alemany). Just eight days after Dr. Alemany diagnosed Mr. Thompson with Baycol-induced myalgia and rhabdomyolysis, Dr. Alemany determined that Mr. Thompson had the Epstein Barr virus and Herpes Virus Type 6. Alemany Expert Rep. (Ex. E) at SPFS000009jat; Alemany Dep. (Ex. D) at 51:23-52:11. Dr. Alemany now believes that these viruses are the cause of Mr. Thompson's ailments. Alemany Dep. (Ex. D) at 51:16-54:1; 55:19-23; 56:8-12; 60:18-25.

Despite having discontinued Baycol more than five years ago, Mr. Thompson claims that he continues to suffer today from conditions that began during his Baycol use. Thompson Dep. (Ex. B) at 154:16-21. None of Mr. Thompson's treating physicians attributes any injury experienced by Mr. Thompson to Baycol. *See* Daigle

Dep. (Ex. A) at 63:19-64:10; St. Cyr Dep. (Ex. C) at 63:22-64:4, 79:23-80:5; Alemany Dep. (Ex. D) at 13:23-15:1; 53:7-54:1; 55:19-23; 60:18-61:16.

**ARGUMENT**

Mr. Thompson alleges that defendants are liable for causing him aches and pains on theories of (1) defective product design, (2) defective product composition, (3) failure to warn, (4) negligence, (5) misrepresentation and concealment, and (6) breach of implied and express warranties. *See* Complaint ¶ 20. All of Mr. Thompson's claims fall under the Louisiana Products Liability Act ("LPLA"), La. R.S. § 2800.51 *et seq.*, which provides the exclusive basis for persons seeking a remedy for product defects under Louisiana law. La. R.S. § 2800.52 (announcing that the LPLA "establishes the exclusive theories of liability for manufacturers for damages caused by their products"); *see also Scott v. American Tobacco Co., Inc.*, __ So.2d __, 2007 WL 495259, at *3 (La. Ct. App. Feb. 7, 2007) (same). Under the LPLA, as well as this Court's PTO 114, Mr. Thompson must prove that Baycol caused his alleged injuries to recover. *See Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342 (5th Cir. 1994) (applying Louisiana law, "A plaintiff must prove not only causation in fact, but also that the product defect was 'the most probable cause' of injury"); *In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1124-25 (D. Minn. 2004) (plaintiff must prove "injury and a causal connection between the claimed injury and the event sued upon").

Under Louisiana law and Pretrial Order 114, specific causation must be proven through expert medical testimony. *In re Baycol Prods. Litig.*, 321 F. Supp. 2d at 1124-25 (D. Minn. 2004) (requiring expert medical testimony); *Chavers v. Travis*, 902

So.2d 389, 394-95 (La. Ct. App. 2005) (plaintiff must prove causation by a preponderance of the evidence through expert medical testimony). Mr. Thompson's treating physicians, including his plaintiff-specific medical expert, testified that they could not opine that he suffered any injury caused by Baycol. Accordingly, summary judgment should be entered against Mr. Thompson.

## I. MR. THOMPSON HAS NO MEDICAL EVIDENCE HIS ALLEGED INJURIES WERE CAUSED BY BAYCOL.

Plaintiff attributes to Baycol a litany of injuries: "[m]uscle pain, muscle weakness, muscle stiffness or aching, dark/discolored urine, joint pain, weight gain, fatigue, nausea and vomiting, swelling of fingers and hands, pain in fingers, pain in back, shoulder, thighs, arm, elbow and calves." Plaintiff's Fact Sheet (Ex. F) at § VI.A.1. None of these claims is supported in the testimony of his treating physicians.

Dr. Randy Daigle, who initially prescribed Baycol to Mr. Thompson and who treated Mr. Thompson from February 2001 through mid-April 2001, testified that Mr. Thompson never presented with any of these complaints. *See* Daigle Dep. (Ex. A) at 54:3-22. (This despite Mr. Thompson's claim that he began to experience all of the conditions he now attributes to Baycol toward the end of February or the beginning of March 2001. *See* Thompson Dep. (Ex. B) at 136:18-138:1. Accordingly, Dr. Daigle stated that he had no basis upon which to conclude that Baycol caused Mr. Thompson any injury. Daigle Dep. (Ex. A) at 63:19-64:10.

Dr. Mark St. Cyr, who treated Mr. Thompson from July 2001 through mid-2002, does not believe Baycol caused Mr. Thompson any harm. *See* St. Cyr Dep. (Ex. C)

at 79:7-80:5. Dr. St. Cyr explained that, if Baycol had caused Mr. Thompson's ailments, they would have resolved after discontinuation of the medicine. *Id.* at 27:10-28:19 (muscle aches, pains, and myopathy induced by a statin should resolve after discontinuation); 63:8-21 (elevated creatinine phosphokinase levels induced by a statin should lower after discontinuation); *id.* at 63:22-64:4 ("it would be extremely rare for [continuing problems] to be related to Baycol"); *id.* at 79:23-80:5 (continuation of complaints that allegedly began with Baycol use, continued long after discontinuation, indicates that Baycol was not the cause)

Mr. Thompson's hired expert Dr. Fernando Alemany, who is also one of his treating physicians, concurs. *See* Alemany Dep. (Ex. D) at 42:17-43:4, 43:17-20 (stating that his experience is that statin-induced conditions resolve upon discontinuation of the statin); 43:5-7 (acknowledging that the medical literature indicates that statin-induced conditions will resolve after discontinuation). Dr. Alemany testified that, if a patient's symptoms initially appeared statin-induced but then persisted after the statin had been discontinued, he would look for other causes of the conditions. *Id.* at 43:8-16.

Further, Dr. Alemany now believes that Mr. Thompson's complaints were probably caused by the Epstein Barr virus and Herpes Virus Type 6 – not Baycol. *See* Alemany Expert Rep. (Ex. E) at SPFS000009jat; Alemany Dep. (Ex. D) at 51:23-52:11; *id.* at 53:7-54:1 (stating that persistent complaints, coming two years after discontinuation of Baycol, indicated that Mr. Thompson's conditions were not caused by Baycol); *see also* Part II, *infra* (discussing Dr. Alemany's retraction of his expert opinion).

Mr. Thompson has no evidence to support his claim that Baycol caused him injury.[2] To the contrary, the evidence supports the opposite: that Baycol did not cause Mr. Thompson's alleged conditions. His action is not supported by a genuine issue of material fact and should be dismissed.

## II. MR. THOMPSON'S CASE-SPECIFIC EXPERT REPORT IS INADMISSIBLE AND HAS BEEN RETRACTED.

Dr. Alemany signed plaintiff's case-specific expert report, which asserted that Mr. Thompson experienced myalgia and rhabdomyolysis caused by Baycol. *See* Alemany Expert Rep. (Ex. _) at ¶ 5. But that initial opinion was simply a reiteration of Mr. Thompson's self-reported complaints and therefore inadmissible under Rule 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). Moreover, Dr. Alemany has retracted the opinions in that report. Accordingly, there are no expert opinions to get Mr. Thompson to trial.

### A. Dr. Alemany's Expert Report Is Inadmissible under *Daubert*.

Dr. Alemany's opinion that Baycol caused Mr. Thompson's alleged injuries is not admissible. Dr. Alemany was enlisted by Mr. Thompson's former attorneys to verify Mr. Thompson's self-reported diagnosis of rhabdomyolysis. *See* Alemany Dep. (Ex. D) at 11:11-18; 48:21-22. Mr. Thompson told him that he had been diagnosed with rhabdomyolysis, and Dr. Alemany did not independently confirm the diagnosis. Alemany

[2] Several of Mr. Thompson's medical records note that Baycol caused rhabdomyolysis. But the authors of those records, Drs. St. Cyr and Alemany, have both testified that they have no evidence Baycol caused Mr. Thompson any injury. *See, e.g.,* St. Cyr Dep. (Ex. C) at 79:7-80:5 (Baycol did not cause Mr. Thompson to suffer rhabdomyolysis, or any injury); Alemany Dep. (Ex. D) at 14:19-15:1, 53:13-20 (no evidence Baycol caused Mr. Thompson any injury).

Dep. (Ex. D) at 48:20-49:4; 49:12-22; 50:3-5. "The self-reporting of a plaintiff's medical history in preparation for litigation, without additional independent confirmation, is inherently unreliable." *Goeb v. Tharaldson*, 615 N.W.2d 800, 816 (Minn. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir. 1994)).

Dr. Alemany also failed to conduct a differential diagnosis. *Id.* at 49:20-22. He did not "rule in" possible causes and systematically "rule out" the least probable until he could identify the most probable cause of Mr. Thompson's conditions, as required under *Daubert*. *See, e.g., Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (defining differential diagnosis). Dr. Alemany frankly admitted that he has never had sufficient evidence to make a principled diagnosis that Mr. Thompson experienced any injury caused by Baycol. Alemany Dep. (Ex. D) at 14:10-16; 53:13-20. Accordingly, Dr. Alemany's initial report should be excluded.

**B. Dr. Alemany Retracted his Opinion that Baycol Caused Mr. Thompson Injury.**

Dr. Alemany has made clear that he cannot stand by his written report. During his deposition, Dr. Alemany conceded that Mr. Thompson's alleged injuries were "probably" caused by Mr. Thompson's Epstein Barr virus and Herpes Virus Type 6. *See* Alemany Dep. (Ex D) at 52:23-53:12; 55:19-23; 56:8-12. Dr. Alemany also admitted that he had no evidence that Mr. Thompson ever experienced any injury as a result of taking Baycol. *Id.* at 53:13-20. Further, Dr. Alemany disclaimed the possibility that Mr. Thompson suffered any continuing or long-term injury as a result of his Baycol ingestion. *Id.* at 53:21-54:1.

Dr. Alemany testified that, although he believed Mr. Thompson had rhabdomyolysis, he could not reliably correlate that injury to Mr. Thompson's Baycol ingestion:

- "I do know that he did have rhabdomyolysis. Actually, he's still having muscle breakdown. Is this something that was caused by Baycol or something that was caused by another condition? I can't tell right now." Alemany Dep. (Ex. D) at 12:9-14;
- "I cannot say right now that Baycol was the injury factor in Mr. Thompson." *Id*. at 14:22-23;
- "I cannot say either way that Baycol did or did not [cause Mr. Thompson any injury]." *Id*. at 15:1.

And Dr. Alemany retracted his opinion that Baycol caused Mr. Thompson injury:

Q: Now, doctor, we've established earlier that based on your continuing treatment of Mr. Thompson and the fact that he still has these muscle aches and pains, that he had the other viruses that we've talked about, based on everything that you know now, you can't say for sure that Baycol caused him any injury, can you?

A: No, I cannot say that.

Q: So this report, when there's a note, number five, it is my opinion that this patient has suffered injuries or damages relate [sic] to this patient's ingestion of Baycol, these injuries include the following, myalgia and rhabdomyolysis, based on what you know now, you can't say that, can you?

A: Correct.

Q: So as we sit here today, this report that says that Baycol caused Mr. Thompson these injuries, again, as we sit here today, you cannot give that opinion in this case, can you?

A: No.

Q: And you can't give any opinions in this case that Baycol caused Mr. Thompson any injury at any time, can you?

A: Not with the information that I have right now, no.

*Id.* at 60:18-61:16.

Thus, Mr. Thompson does not even have the testimony of his own retained expert to support his claim. Without the support of expert medical testimony as required by the Court in PTO 114 and the law of the State of Louisiana, Mr. Thompson's claims must be dismissed. *In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1124-25 (D. Minn. 2004) (plaintiff must prove "injury and a causal connection between the claimed injury and the event sued upon"); *Chavers v. Travis*, 902 So.2d 389, 394-95 (La. Ct. App. 2005) ("expert medical testimony is required when the conclusion regarding medical causation is one that is not within common knowledge").

**CONCLUSION**

For the foregoing reasons, plaintiff James Thompson's claims are not supported by evidence sufficient to create a genuine issue of material fact. Accordingly, this Court should enter summary judgment against Mr. Thompson and in favor of defendants.

Dated: March 21, 2007

Respectfully submitted,

Philip S. Beck
Adam Hoeflich
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

Scott A. Smith
Tracy J. Van Steenburgh
HALLELAND LEWIS NILAN SIPKINS & JOHNSON, P.A.
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402-4501
(612) 338-1838

/signature on file/
Susan A. Weber
Tamar B. Kelber
James W. Mizgala
James R.M. Hemmings
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Paul J. Zidlicky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Richard K. Dandrea
ECKERT SEAMENS CHERIN & MELLOTT LLC
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA 15219
(412) 566-6000

Peter W. Sipkins (No. 101540)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

Douglas R. Marvin
WILLIAMS & CONNOLLY
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Charles P. Blanchard
CHAFFE McCALL LLP
230 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 585-7000

*Counsel for Bayer Corporation*

/signature on file/
Fred T. Magaziner
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Counsel for SmithKline Beecham Corporation d/b/a GlaxoSmithKline*