# Exhibit A

21942



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

ORIGINAL

| | |
|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | |
| This Document Relates To: | MDL NO. 1431 (MJD) |
| JAMES THOMPSON, v. BAYER CORP., et al | CASE NO. 02-cv-00163 |

**DEPOSITION OF DR. RANDY DAIGLE**

The oral deposition of DR. RANDY DAIGLE was taken in the above-entitled cause, pursuant to the following stipulations, before Cheryl Venable, CCR, at the offices of Dr. Daigle, 990 Napoleon Avenue, Sunset, Louisiana, on the 11th day of July 2006, beginning at 4:00 p.m.

DR. RANDY DAIGLE

After having been first duly sworn was examined and did testify as follows:

EXAMINATION

BY MR. ARMSTRONG:

Q Dr. Daigle, my name is Keith Armstrong. I'm here today on behalf of Bayer to take your deposition as it relates to a lawsuit filed by Mr. James Thompson. And the purpose today is, of course, to sort of cover some of the information that you obtained through one or more visits you had with him. And so we'll get into that after we cover some general areas. But if you would, let's first start with giving the court reporter your full name, our address currently here and your area of practice.
A Randy James Daigle, family practitioner at Sunset Medical Clinic, 990 Napoleon Avenue, Sunset, Louisiana 70584. And what else would you like?
Q I think you covered it. Family practice, right?
A Right.
Q And are you a board certified family practitioner?
A Yes.
Q And when did you get your board certification?
A Seven years ago.

October 9th of 2000. Would that be correct?
A Correct.
Q And at that point in time, the cholesterol and the triglycerides were extremely elevated to the extent cholesterol was 298 and his triglycerides were 548, right?
A Correct.
Q And there's no LDL on here identified. Is that because the triglycerides are too high?
A That's one factor that sometimes you get an erroneous reading. It's also -- you can essentially calculate if you just simply subtract and get an estimation of what their LDL would be. You take the total cholesterol and substract HDL and you've got a roundabout idea where their LDL would be.
Q But here the LDL roughly would be about 248 or 250?
A Right.
Q And what would you expect the normal LDL level to be?
A By consensus 160 should be the highest, again, depending on your risk factors. If you have coronary disease, we might want it as low as 70 by current standards. 160 is the cut-off.
Q And he's got hypertension?

A Right.
Q And he certainly doesn't present with obesity, but he's got additional risk factors on top of simply having high cholesterol for heart decease?
A Correct.
Q So in his -- in Mr. Thompson's case, 160 would be probably high in and of itself?
A I think, again, those guidelines you mentioned earlier would probably say 130 in his case would be more appropriate.
Q So at 250 he's not just elevated; he's critically high?
A Double the normal.
Q The test results also reveal the ASTA, LT or the SGOT, SGPT -- I apologize. SGOT and the SGPT levels, those are liver enzymes, right?
A Correct.
Q And those are both elevated in this particular case, correct?
A Mildly elevated, yes.
Q Mildly elevated. Now, there is a reference at the bottom portion of this note as well. Oh, let me stop.
A That answers our question on where he got the Norvasc, too.

Q Right. Let me ask you about the creatine being high. What significance is that?

A Again, in this particular case, Dr. Dugal apparently decided it may have been a consequence of the Accupril. I mean you can see elevated creatinine as an effect on the Accupril. It could also mean that he had true kidney disease that had been unrecognized previously.

Q And I said creatine previously. I apologize. It's creatinine?

A Creatinine, right.

Q And on this particular note at the bottom of the lab, it references a date of October 10th, 2000 and it talks about giving the patient presumably a low cholesterol diet and low -- what is that? Low --

A Where are you at?

Q At the bottom right-hand portion.

A Low cholesterol diet, yes. And it says given to the patient.

Q So the patient at that point in time --

A I think it says now on diet is what it says.

Q So presumably at this junction, the patient was at least advised at this point in time to modify his diet?

A Correct.

Q And in the following lab report and I guess the only other lab report would have been that which you requested on February 2nd, 2001, correct?

A Correct.

Q At this point in time, his cholesterol was at 272 and his triglycerides are at 342?

A Correct.

Q And in conjunction with this study, it was your recommendation that he begin a course of Baycol?

A Correct. He's not been able to reduce that number to what's considered recommended levels. The other thing we do see is his kidney function is better off with the ACE inhibitor.

Q Right. And there's a reference at the bottom also to diet sheet mailed?

A Correct.

Q This is provided to the patient?

A Correct.

Q Now, in terms of the prescription that you wrote for him for Baycol, I'm looking back again to the original note that you had. It's a point four milligram thirty with three refills; is that right?

A Correct.

Q So this would be something he's taking once a day, taking thirty pills per prescription. So

essentially it gets him through ninety days of
medication, right?
A Right. Through a hundred twenty potentially. It
was an original with three refills. Potentially a
hundred twenty days.
Q So there's four actual scripts to this?
A Correct.
Q Okay. Now, the next note that I see in the file
relates to Mr. Thompson I guess on March 5th of
'01. Did he come in for this or this is a call-in?
A No. This is a call-in where the patient requested
Xanax and we gave him one refill apparently. It
says no refills. He apparently received that
prescription.
Q Right. And then he called back again one month
later on April 6th of '01 asking for a refill and
you refused it?
A Correct.
Q Now, what was the purpose of refusing to refill his
Xanax at that time?
A He was supposed to have a follow-up by this point.
Again, like they say, if it's not documented --
sometimes we get caught for being told we didn't do
it, but the general rule is we check those
patients' enzymes and lipid panels within a certain

period of time and by this time he's supposed to be back to the clinic for follow-up and he's not shown up.

Q And so based upon that, rather than go ahead and continue prescribing medication, you simply advise that you can't prescribe it and the hope is presumably that he will show up at the office and have his labs run and subsequently get his medications?

A He's not complying with instructions we give patients on these kind of treatments.

Q Right.

A And it's an addictive habit-forming drug also which we are required to monitor.

Q Now, according to the records, the patient then calls three days after your refusal to refill the Xanax and asked for a copy of his records because he's going to go see another physician, correct?

A Correct.

Q And since that time, you haven't had any contact with Mr. Thompson?

A To my knowledge, I have not seen Mr. Thompson since that one visit.

Q And there's no indication in your chart that there has been any visits with Mr. Thompson by anybody in

your office; is that right?
A That's correct.
Q Now, I want you to assume that in Mr. Thompson's testimony that he has already given, he asserts that within three weeks of beginning the medication Baycol he began suffering aches and pains, stiffness, weakness, tenderness, fatigue, dark urine, nausea and vomiting. Based upon the information that you have in your record, there was never any complaint to anyone in this office regarding those issues; is that correct?
A That's correct.
Q In fact, as we sit here today looking at your record, exclusively at your record, there's no indication whatsoever that Mr. Thompson ever had any adverse effects from taking Baycol; is that correct?
A We don't have any literature or notes to that extent, no blood tests, et cetera. We don't have any follow-up. We have no -- we have a request for medication and three separate issues where we could have been contacted and that was not mentioned.
Q Now, if samples -- according to Mr. Thompson, he never received samples from this office, but if samples had been received through this office,

prescription being filled that he would have been without Baycol and then he would have been again out of Baycol by roughly July -- I mean I'm sorry -- August 10th? Would that be accurate?

A Yes.

Q And so if the patient were to assert that he was being compliant in taking his medication and still taking medication in September of '01, that would be impossible both from a physician's standpoint and a mathematical standpoint, right?

A If these are the only pharmacies filled and he didn't have samples, I'm at a loss to explain how that occurred. I really don't know.

Q Finely, as it relates to the records that you have before you, I gather you don't know anything about Mr. Thompson's condition once he left you all's office?

A Correct.

Q So as it relates to the information that is before you and your knowledge and care and treatment of Mr. Thompson, along with Dr. Dugal's, as limited as it may be, is there any indication in the record during the time that he was treating with this office that he was having any side effects from Baycol?

A No.

Q And so based solely on that information that you have available to you, is it reasonable to assume that more probably than not Mr. Thompson did not sustain any side effects from Baycol while under the care of yourself and Dr. Dugal?

A I would say I have no information to tell me that he probably did. I have no information to say that he did have rhabdomyolysis or side effects from the medication period.

MR. ARMSTRONG: Okay. I have no further questions.

MR. POTTS: No questions.

MR. PARKER: No questions.

(DEPOSITION CONCLUDED AT 5:30 P.M.)

# Exhibit B

219412



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

ORIGINAL

| | |
|---|---|
| In re: BAYCOL PRODUCTS LITIGATION | : |
| This Document Relates To: | : MDL NO. 1431 (MJD) |
| JAMES THOMPSON, v. BAYER CORP., et al | : CASE NO. 02-cv-00163 |

**DEPOSITION OF JAMES THOMPSON**

The oral deposition of JAMES THOMPSON was taken in the above-entitled cause, pursuant to the following stipulations, before Cheryl Venable, CCR, at the offices of Mr. Jamie Parker, 556 Jefferson Street, Lafayette, Louisiana, on the 17th day of May 2006, beginning at 9:15 a.m.

JAMES THOMPSON

After having been first duly sworn was examined and did testify as follows:

EXAMINATION

BY MR. ARMSTRONG:

Q Mr. Thompson, my name is Keith Armstrong and I'm here today to take your deposition related to a lawsuit that you filed against Bayer Corporation and other companies. And essentially what we're going to do is just simply ask you some questions and try to get as much information from you as we possibly can about the circumstances surrounding your claim, background information, that type of thing. There will be a couple of questions along the way that may sound offensive to you. I apologize in advance. I'm not trying to offend you, but they're just simply questions we'll have to ask. Additionally, we will -- if at any point in time during the deposition you want to take a break, please let me know. I'll be more than happy to accommodate you. If you do not understand any of my questions, please let me know. I'll be happy to rephrase them. I just want to make sure that you and I are communicating effectively. And also when you answer, if you

Q Have you ever had difficulty with nausea and vomiting?
A Yes, sir.
Q When was that?
A In the mornings mostly. Sometimes I still go through that.
Q Let me ask you. I mean when did this start?
A I would say when I had started -- months after the medication I would say in the mornings. I still do it, but it's not always -- sometimes I get up and my stomach is upset and I throw up and spit up. I've been going through that for years.
Q Let me ask you this. You and I talked about we were going to use the deadline of February 5th of 2001 as being the date you began taking Baycol, right?
A Yes.
Q And it's your testimony within about two months of that, you began experiencing these symptoms; is that right?
A Before two months, I would say.
Q One month?
A Yes, sir.
Q Within a month you began experiencing symptoms. Now, those symptoms would have included muscle

aches and stiffness?
A Yes, sir.
Q Would it have included muscle weakness and tenderness?
A Yes, sir.
Q Would it have included fatigue?
A Yes, sir.
Q Dark urine?
A Yes, sir.
Q Nausea and vomiting?
A Yes, sir. I was experiencing that then.
Q Anything else?
A Just the muscle pains and, you know, like just get up in the morning like hurt all over, but mainly in my lower calves and, you know, my lower back and stuff is mainly where it was hurting.
Q So if you began taking it -- if you filled the prescription and began taking it on the very first day, that's February 5th of 2001, by March 5th, 2001, that would be thirty days later, that's about when you would have experienced many of these symptoms, started experiencing these symptoms?
A It was about three weeks to a month that I started experiencing the muscle pains and stuff.
Q So maybe into February, early part of March?

A Yes, sir.
Q And who did you complain to of these symptoms? Dr. St. Cyr?
A Well, I went back to Dr. Randy Daigle within -- by that period of time complaining, you know, hurting in my elbows and my legs and stuff and he just wasn't sure what could have caused it.
Q Now, the hurting in your elbows and legs, is that what you're calling muscle aches and stiffness?
A Well, in my calves, the muscles in the calves and the lower back, the stiffness. And like in my joints, you know, I was having -- you know, like in my elbow joints.
Q Well, I understand that. We're going to get into that. But my point is if you went to Dr. Daigle and your complaint to Dr. Daigle was I'm having these problems, I'm assuming you told Dr. Daigle about the enormous onset of all of these symptoms when you showed up to his office three weeks later?
A Yes, sir.
Q So his office records ought to reflect that you were complaining of nausea and vomiting because you testified you had that, right?
A I did have it.
Q And you complained to him about it?

reasonable to assume that when that occurred shortly after your first visit with Dr. St. Cyr and you got the pain medication, that you returned to him on your next visit and complained about the rest of those symptoms?
A I'm sure I did, sir.
Q Okay. Now, you testified earlier that in conjunction with your treatment with Dr. Daigle, Dr. Daigle basically gave you some pain medication but was unable to determine what your problem -- what was causing the problem; is that right?
A Dr. Daigle didn't give me any pain medicine.
Q Oh, he didn't?
A No, sir. You know, he didn't understand, you know, why I was hurting and stuff. And I just got tired of hearing the same thing. Nobody knows what's doing it, so I just took it on my own to see another -- you know, just take it to another doctor and ask him what, you know, it could be. And that's what got me to Dr. St. Cyr.
Q Well, isn't it true that the reason you left Dr. Daigle's office and went to Dr. St. Cyr was because Dr. Daigle wouldn't refill your Xanax?
A I don't know about the Xanax.
Q According to the records that he provided, that

upset stomach?
A I've never really experienced it that I can say before that.
Q Now, according to the plaintiff's fact sheet that we went over earlier, you complained of a number of things on here, the first of which is muscle pain. And the muscle pain that you're talking about, is that related to the calves, elbows, arms, low back and joints?
A Yes, sir.
Q And then the muscle weakness, where is that located?
A It's like a widespread of my muscles. It just feels like it's tired, you know, like my muscles in my arms and legs are tired.
Q Of all of the problems that we've been talking about that started when you were on Baycol, have any of them gotten any better?
A No, sir.
Q Have any of them gotten worse?
A I would say probably worse.
Q Which ones?
A My calves, my lower back. And just what I've experienced from taking the medicine and stuff, I still have the same symptoms. It's not really

To be honest with you, I didn't know nothing about Bayer Aspirin being involved in it. I just know as much as the Good Lord knows, that I was affected by the medication whether you all believe it or not.

Q Do you know that this suit was filed as a class action?

A At first it was a class action, yes, sir, and then they broke it in individual. I assume that's what happened.

Q Are you going to proceed -- I've got a series of questions I need to ask with regards to class actions and I can either ask those questions of you or you can stipulate with your counsel right now that you will not be proceeding as a class action and you will be proceeding individually in your own claim.

A An individual in my own claim.

Q As we're sitting here today, you're willing to stipulate that you are not going to proceed as a class representative or seek to be a class representative or seek to have this matter handled as a class action, but you're going to handle it on your own; that is, a single lawsuit filed by Mr. Thompson against Bayer and any other listed defendant?

A As of right now, I assume that's how it's going to be. I can't tell you exactly, but as of right now, it will be me against Bayer.
Q The effect of the stipulation would be binding upon you and would not allow you to go back. So rather than making that stipulation and given the fact that you may be changing attorneys, let me just ask you these questions so we can get this out of the way, okay. Do you know what a class action is?
A When a group of people go in a lawsuit together.
Q Right. And do you know what this lawsuit is about?
A About me versus Bayer.
Q Taking Baycol, right?
A Yes, sir.
Q And do you understand that you were listed as a class representative in the lawsuit?
A Yes, sir.
Q And do you know what a class representative does?
A Not really to be honest.
Q When did you find out that you were listed as a class representative?
A When this thing first took off. I would say the end of the 2001 year or something like that, somewhere around when the lawsuit was filed maybe.
Q And who do you understand that you would be

going to call for a follow-up with him. That was the doctor I saw for my heart.
Q How long has it been since you've seen Dr. Chen?
A That's been a while. A year or better probably.
Q So as we sit here today, the doctors that you are presently seeing on a regular basis would be Dr. Lecorgne, Dr. Alemany and Dr. Rice?
A Yes.
Q Any other ones that you're currently treating with?
A No, sir.
Q You do intend on going back to Dr. Chen?
A For a checkup with my arm and stuff.
Q Anybody else?
A No, sir.
Q There seems to be a discrepancy about the amount of smoking in your past. You indicated on here that you had smoked about a half a pack for three years, but there's some question about it in the records of smoking more than that.
A I wasn't no big smoker. I stopped when I was about twenty. I haven't smoked in -- I'm forty-two -- I'll be forty-two. I haven't smoked since about twenty years old.
Q And were you smoking more than a pack a day?
A I wasn't a real big smoker. I smoked a little bit.

# Exhibit C

21942

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE BAYCOL PRODUCTS LITIGATION | * MDL NO. 1431 * (MJD) |
| THIS DOCUMENT RELATES TO: JAMES THOMPSON | * |
| | * CASE NO. 02-ev-00163 |
| VERSUS | * |
| BAYER CORPORATION, ET AL | * |

************************************************************

ORAL TESTIMONY OF

DOCTOR MARK A. ST. CYR

************************************************************

TAKEN AT THE BEST WESTERN INN, IN ALEXANDRIA, LOUISIANA ON THE 8TH DAY OF AUGUST, 2006, BEGINNING AT 10:00 A.M., REPORTED BY NANCY H. LAFLEUR, C.C.R.

************************************************************

ORIGINAL

BILLY REED COURT REPORTING
CERTIFIED COURT REPORTERS
POST OFFICE BOX 13652
ALEXANDRIA, LOUISIANA 71315-3652
(318) 640-2788

**DOCTOR MARK A. ST. CYR,**

HAVING PREVIOUSLY BEEN SWORN, TESTIFIED ON HIS OATH AS FOLLOWS:

**E-X-A-M-I-N-A-T-I-O-N**

**BY MR. ROTOLO:**

Q GOOD MORNING, DOCTOR. COULD YOU PLEASE STATE YOUR NAME AND ADDRESS FOR THE RECORD?

A MY NAME IS MARK ANTHONY ST. - ST. CYR, S-T, PERIOD, C-Y-R. MY HOME ADDRESS IS 112 OAK FOREST DRIVE, LAFAYETTE, LOUISIANA, 70501.

Q OKAY. AND, DOCTOR, AS WE MENTIONED EARLIER MY NAME IS PETER ROTOLO, AND WE'RE HERE TO TALK TO YOU ABOUT YOUR TREATMENT OF MR. THOMPSON IN A LAWSUIT THAT HE HAS FILED AGAINST BAYER AND GLAXO-SMITHKLINE AS A RESULT OF HIS USE OF BAYCOL. HAVE YOU EVER GIVEN A DEPOSITION BEFORE?

A YES, SIR.

**MR. ROTOLO:**

JUST FOR THE RECORD I'M GOING TO ATTACH AS EXHIBIT ONE AN E-MAIL I RECEIVED YESTERDAY FROM SUSAN THOMAS OF THE WRIGHT LAW FIRM AND THE E-MAIL IS AS FOLLOWS. IT CAME IN ABOUT TWO THIRTY-SEVEN TO MY ASSOCIATE, WHICH INDICATES MR. WRIGHT IS NOT GOING TO BE ABLE TO ATTEND THE DEPOSITION OF DOCTOR ST. CYR SCHEDULED FOR TOMORROW AND IS WAIVING HIS APPEARANCE FOR

Q WOULD - AT A POINT MAYBE WOULD YOU CONSIDER SWITCHING TO A DIFFERENT STATIN MEDICATION?
A IF THE SYMPTOMS CONTINUE YOU COULD - YOU WOULD SWITCH THEM.
Q WHEN YOU HAD A PATIENT COME IN WITH - THAT WAS ON A STATIN MEDICATION AND THE BLOOD WORK INDICATED AN ELEVATED LIVER ENZYME WAS YOUR PROTOCOL BASICALLY THE SAME APPROACH?
A YES, SIR. IT - WELL, YOU WOULD STOP THE MEDICATION AT THAT TIME.
Q IN YOUR EXPERIENCE WITH PATIENTS WHO HAD MYOPATHY, MYALGIAS AND ELEVATED LIVER ENZYMES WHEN YOU DISCONTINUED THE MEDICATION DID YOU FIND THAT THOSE CONDITIONS, IF THEY WERE CAUSED BY THE STATIN, WOULD RESOLVE OVER - OVER A PERIOD OF TIME?
A YES, SIR.
Q YOU ARE NOT AWARE OF ANY LITERATURE OR ANY INFORMATION, AT LEAST IN YOUR EXPERIENCE AND YOUR KNOWLEDGE, THAT INDICATES THAT STATINS HAVE ANY LONG-TERM ADVERSE SIDE EFFECTS?
A NO, SIR.
Q ISN'T IT TRUE, DOCTOR, THAT THE - THE LITERATURE BASICALLY SAYS IF AN ADVERSE SIDE EFFECT LIKE MYOPATHY, MYALGIA OR ELEVATED LIVER ENZYMES ARE CAUSED BY THE STATIN THEN THEY WILL CLEAR UP OVER A SHORT PERIOD OF TIME AFTER THE STATIN'S DISCONTINUED?

A I CAN'T ANSWER YES OR NO, I'D HAVE TO --
Q SURE.
A -- ASK - ASK YOU. IT'S TRUE, BUT ALSO I WANTED TO - YOU KNOW, A SHORT TERM/LONG TERM DEFINITION OF IT PER SE, BUT IN GENERAL MOST PEOPLE IN A SHORT TERM. AND WHEN YOU SPEAK IN - IN MEDICAL TERMS JUST IN A GENERAL, IN MEDICAL TERMINOLOGY, --
Q SURE.
A -- SOMETHING THAT'S CONSIDERED LONG TERM, IF IT'S OVER SIX MONTHS. IF IT'S LESS THAN SIX MONTHS THEN A SHORT TERM. AND, YES, THE LITERATURE FOR THE MOST PART IS SHORT TERM, TO ANSWER YOUR QUESTION.
Q DID YOU EVER HAVE A PATIENT - AND AGAIN I - I - I DON'T WANT TO TALK SPECIFICALLY ABOUT MR. THOMPSON NOW, BUT IN GENERAL DID YOU EVER HAVE A PATIENT THAT WAS ON A STATIN AND HAD ADVERSE SIDE EFFECTS FOR LONGER THAN SIX MONTHS AFTER THEY WERE DISCONTINUED THAT YOU RELATED TO THE STATIN?
A NO, SIR.
Q IN YOUR PRIVATE PRACTICE DID YOU EVER PRESCRIBE BAYCOL?
A YES, I HAVE, BUT I DON'T KNOW HOW MANY TIMES OR - OR --
Q BUT IT WAS ONE OF THE STATIN MEDICATIONS ALONG WITH OTHERS THAT YOU PRESCRIBED?

A I HAD NEVER SAW HIM BEFORE.
Q DO YOU KNOW WHY HE CHOSE TO COME SEE YOU?
A NO, SIR.
Q BECAUSE I THINK HE WAS SEEING DOCTOR - DOCTOR DAIGLE BEFORE HE SAW YOU. DID YOU - DID YOU KNOW DOCTOR DAIGLE?
A THERE'S MORE THAN ONE DOCTOR DAIGLE IN LAFAYETTE AREA, SO I'M NOT SURE WHICH ONE HE WAS SEEING.
Q DOCTOR RANDY DAIGLE.
A NO, I - I DIDN'T KNOW HIM. I REALLY COULDN'T SAY WHY HE CAME TO ME. I WOULD - I WOULD BE SPECULATING. YOU KNOW, - YOU KNOW, COULD BE LOCATION.
Q SO YOUR RECORDS INDICATE YOU FIRST SAW HIM ON JULY 30TH OF 2001 AND THAT HIS COMPLAINTS ON THAT DAY, ACCORDING TO THE HISTORY HE GAVE, WAS BLOOD PRESSURE, TENSION, CHOLESTEROL AND PAIN IN HIS ELBOW AND SHOULDER. IS - IS THAT CORRECT?
A YES, SIR.
Q AND I BELIEVE AT THAT TIME HE INDICATED THAT YOU - HIS MEDICATIONS WAS - WAS NORVASQ, BAYCOL AND XANAX.
A YES, SIR.
Q AND I TAKE IT THAT HE EITHER HAD HIS MEDICATIONS OR THAT WAS AN ORAL RECITATION THAT HE GAVE YOUR NURSE OR YOURSELF WITH REGARD TO WHAT MEDICATIONS HE WAS ON?
A YES, SIR.
Q AND I THINK HE ALSO INDICATED HIS MOTHER HAD A

PRESCRIBE XANAX.

Q AND I THINK HE INDICATED HE HAD AN ANXIETY DISORDER SINCE HIS CHILDHOOD DAYS THAT YOU NOTED?

A YES, SIR.

Q AS WE INDICATED, HE INDICATED OR HE BROUGHT HIS MEDICATION IN AND HE WAS ON BAYCOL AT THAT POINT. DO YOUR NOTES REFLECT THAT HE MADE ANY COMPLAINTS ON JULY 30TH, 2001 WITH REGARD TO HIS BAYCOL MEDICATION, THAT HE COMPLAINED ABOUT HIS BAYCOL MEDICATION?

A NOT SPECIFICALLY.

Q AND I WOULD SUPPOSE THAT SINCE YOU MAINTAINED HIM ON THAT MEDICATION YOU DIDN'T SEE ANYTHING IN YOUR EXAM OF HIM THAT LED YOU TO BELIEVE THAT BAYCOL WAS CAUSING HIM ANY PROBLEMS AT THAT TIME?

A THAT IS CORRECT.

Q BECAUSE I - I SAY, DOCTOR, IF YOU HAD SEEN ANY PROBLEMS THAT YOU ASSOCIATED WITH BAYCOL YOU WOULD HAVE TOLD HIM TO STOP TAKING IT?

A THAT IS CORRECT.

Q I NOTICED ON THAT VISIT YOU ORDERED A LIPID PANEL, LIVER FUNCTION TEST, ET CETERA, AND I GUESS THAT WAS STANDARD PROCEDURE BOTH FOR A NEW PATIENT AND FOR SOMEONE WHO'S ON A STATIN MEDICATION; IS THAT CORRECT?

A YES, SIR. I WANTED TO - TO SEE MY OWN NUMBERS NOT HAVING SEEN HIM BEFORE.

Q AND AS A PHYSICIAN, AND THIS MAY SOUND SOMEWHAT COMMONSENSE, WHEN YOU ORDER A LAB WORK ON A PATIENT YOU CANNOT MAKE THAT PATIENT GO DO THE LAB WORK?

A THAT IS TRUE.

Q AND THE REASON I SAY THAT IS BECAUSE I SEE WHERE YOU ORDERED THE LAB WORK ON JULY 30TH, BUT I DON'T SEE ANY CORRESPONDING LAB RESULTS.

A THAT'S TRUE. I LOOKED THROUGH OUR NOTES AS WELL AND I DID NOT SEE IT. AND WHAT - THE STATEMENT YOU MADE IS NOT UNCOMMON, YOU CAN OFTENTIMES ORDER IT AND THEY WON'T GO AND GET IT.

Q SO CHANCES ARE MR. THOMPSON JUST DIDN'T GO GET HIS BLOOD WORK DONE WHEN YOU ORDERED THAT TO BE DONE?

A THAT IS TRUE.

Q WHEN - DO YOU KNOW IF MR. - AND I DON'T KNOW IF YOU COULD TELL. I DIDN'T SEE ANYTHING IN THE RECORDS, BUT I DON'T KNOW IF YOU HAVE ANY INDEPENDENT RECOLLECTION IS WHY I'M ASKING. DO YOU REMEMBER IF HE BROUGHT WITH HIM ANY OF HIS PRIOR MEDICAL RECORDS TO THIS VISIT?

A MY RECALL TELLS ME NO.

Q AND THE ONLY REASON I ASKED THAT IS THERE WAS A NOTATION IN DOCTOR DAIGLE'S RECORDS RIGHT BEFORE HE SAW - WENT TO SEE YOU FOR THE FIRST TIME WHERE HE REQUESTED A COPY OF HIS MEDICAL RECORDS FROM DOCTOR DAIGLE. AND THAT'S THE ONLY REASON I ASKED AND I DIDN'T SEE THE NOTATION.

SAMPLES TO LAST HIM FROM - FOR A COUPLE OF MONTHS?
A IF HE HAD BEEN ON IT - AND I'LL SPEAK IN GENERAL, NOT JUST HIM, BECAUSE I DON'T HAVE SPECIFIC RECALL, BUT IF HE HAD BEEN TOLERATING IT AND WAS NOT COMPLAINING OF ANY - ANY PARTICULAR SYMPTOMS THAT MAKE ONE SUSPICIOUS IF I HAD IT THERE I POTENTIALLY COULD HAVE.
Q BUT FROM YOUR RECORDS YOU CANNOT TELL --
A NO.
Q -- HOW MANY SAMPLES YOU GAVE HIM OR IF YOU GAVE HIM SAMPLES; IS THAT CORRECT?
A CORRECT.
Q OKAY. LET'S GO TO YOUR VISIT ON SEPTEMBER 5TH OF 2001. AND JUST FOR YOU LOOKING AT YOUR RECORDS, THAT'S GOING TO BE BATES NUMBER PAGE TWELVE. I BELIEVE AT THAT TIME HE CAME IN COMPLAINING OF PAIN IN BOTH OF HIS ELBOWS, HIS CHEST AND NECK, SOME LOWER BACK PAIN AND HE INDICATED THAT HE NEEDED TO CHANGE HIS CHOLESTEROL MEDICATION AND THAT HE WAS TAKING BAYCOL. IS THAT - IS THAT CORRECT FROM YOUR RECORD, DOCTOR?
A THAT'S CORRECT, AND IT ALSO SAYS TIMES EIGHT MONTHS.
Q SO THAT INDICATES HE HAD BEEN ON BAYCOL FOR APPROXIMATELY EIGHT MONTHS?
A YES, SIR. AND FOR CLARIFICATION THAT'S MY HANDWRITING WHERE IT SAYS EIGHT MONTHS. THAT'S NOT MY HANDWRITING AT THE TOP.

TIME, IT WAS ONLY HIS ELBOW AND HIS --
Q SORRY.
A -- SHOULDER.
Q I'M SORRY. SO IT WAS JUST SPECIFIC PAIN WITH HIS ELBOW AND SHOULDER AND HE WASN'T MAKING ANY OF THOSE GENERALIZED CRAMPS, MUSCLE ACHE TYPE COMPLAINTS?
A THAT CAME SEPTEMBER.
Q OKAY. DOCTOR, AT THIS POINT IN NOVEM - WELL, LET'S JUST SAY IN NOVEMBER 9TH OF 2001 WHEN YOU SAW HIM AND HIS C.K. WAS DOWN TO A HUNDRED AND EIGHTEEN, WOULD IT BE YOUR OPINION, BASED ON YOUR EXPERIENCE, THAT IF THESE MUSCLE ACHES, GENERALIZED CRAMPS WERE RELATED TO HIS BAYCOL USE WHICH HAD BEEN DISCONTINUED FOR APPROXIMATELY TWO MONTHS AND HIS C.P.K. WAS DOWN TO NORMAL THAT MORE LIKELY THAN NOT THOSE ARE NOT RELATED TO HIS BAYCOL USE?
A YES, SIR.
Q BECAUSE IN YOUR EXPERIENCE THOSE SHOULD HAVE RESOLVED WHEN HIS C.P. - IF HE WAS SUFF - IF THEY WERE THE RESULT OF BAYCOL THEY SHOULD HAVE RESOLVED AFTER A PERIOD OF TIME AND HIS C.P.K. CAME DOWN TO NORMAL?
A YES, SIR.
Q AND IF MR. THOMPSON TESTIFIED IN HIS DEPOSITION JUST A FEW MONTHS AGO THAT HE WAS STILL HAVING THE SAME COMPLAINTS OF THE MUSCLE ACHES, MUSCLE WEAKNESS, CRAMPING TODAY WOULD THAT INCREASE YOUR OPINION THAT THOSE SYMPTOMS

WERE NOT RELATED TO HIS BAYCOL USE?
A IT'S VERY UNLIKELY IT WOULD BE RELATED TO BAYCOL AND - AND IT WOULD BE EXTREMELY RARE FOR IT TO BE RELATED TO BAYCOL.
Q I THINK HE CAME BACK ON DECEMBER THE 5TH OF '01, AND THAT'S BATES NUMBER PAGE EIGHT. AND, DOCTOR, I'LL TRY TO MOVE A LITTLE BIT QUICKER TO GET YOU OUT OF HERE. AT THAT POINT HE WAS COMPLAINING OF SOME EDEMA TO HIS FEET AND PAIN IN HIS ARMS AND LEGS. I THINK HE ALSO COMPLAINED OF CRAMPING IN HIS CALVES, FINGERS AND ARMS; IS THAT CORRECT?
A YES, SIR.
Q AND THEN HE WAS COMPLAINING OF SOME LOWER EXTREMITY SWELLING AT NIGHT FOUR TO FIVE NIGHTS A WEEK. AND I THINK YOU NOTED THAT HIS LOWER EXTREMITIES WERE NOT SWOLLEN ON EXAM?
A YES, THAT'S IN - IN MY NOTE. AND I PUT IT ON THERE BECAUSE WHEN HE SAW THE NURSE HE TELLS THE NURSE THAT THAT'S WHAT HE HAS. WHEN I SAW HIM OBJECTIVELY, YOU KNOW, I CAN'T SAY IF HE'S HAVING PAIN OR IF HE'S HAVING MYALGIAS, THAT'S SUBJECTIVE. NOW, WHETHER HE CAME IN SEPTEMBER OR - OR WHAT HAVE YOU, BUT I CAN TELL YOU WHAT I SAW AND HE DIDN'T HAVE THE - THE SWELLING.
Q I NOTICE HIS BLOOD PRESSURE WAS ONE SIXTY-TWO OVER NINETY. IS THAT HOW --
A IT'S - IT'S IMPROVED.

LOOK AT --
Q AND YOU THINK THAT'S HAPPENED HERE?
A NOW, THAT'S - THAT'S SPECULATION, THAT'S OPINION. IF YOU LOOK AT THE RECORD AND THE TIME FRAME IN WHICH HE PRESENTED AND - AND WHAT'S WRITTEN IN THE RECORD THEN I WOULD HAVE TO SAY YES.
Q DOCTOR, IN YOUR OPINION BASED ON THE RECORDS WE'VE GONE THROUGH - AND I'VE ALREADY ASKED THIS BUT I JUST WANT TO MAKE SURE IT'S CLEAR FOR THE RECORD. IN YOUR OPINION BASED ON THE RECORDS WE'VE GONE THROUGH BAYCOL DID NOT CAUSE MR. THOMPSON TO SUFFER RHABDOMYOLYSIS?
A THAT'S CORRECT, THAT'S EVIDENCE THAT YOU PRESENTED TODAY IN YOUR RECORD.
Q IS IT YOUR OPINION, DOCTOR, THAT - DID BAYCOL CAUSE MR. THOMPSON ANY INJURY THAT YOU CAN SEE?
A MOST IT WOULD HAVE CAUSED WOULD BE MUSCLE ACHE OR MYALGIA, BUT ONCE AGAIN AS I MENTIONED TO YOU THAT'S A SUBJECTIVE COMPLAINT. WE HAVE TO RELY UPON WHAT HE TELLS US. AND THAT PARTICULAR SYMPTOMATOLOGY, YOU ASKED ME EARLIER, HE SAYS HE'S STILL HAVING IT RIGHT NOW. THE LITERATURE DOES NOT SUPPORT THAT KIND OF A SYMPTOM BEING PRESENT AND AT THIS PRESENT TIME, THAT MANY YEARS LATER.
Q SO, DOCTOR, BASED ON HIS COMPLAINT, HIS SUBJECTIVE COMPLAINTS, HIS CURRENT CON - WHAT HE'S ALLEGING TO BE HIS CURRENT CONDITION, THE FACT THAT THESE CONTINUED WELL AFTER

THE FACT THAT HE WAS ON BAYCOL AND THAT HIS ELEVATED LIVER TESTS WERE BOTH BEFORE AND AFTER HIS USE OF BAYCOL WOULD IT BE YOUR OPINION THAT BAYCOL WAS NOT THE CAUSE OF THESE PROBLEMS THAT HE'S COMPLAINING ABOUT?

A YES, SIR.

**MR. ROTOLO:**

DO YOU HAVE ANYTHING?

**MS. GUY:**

I DON'T HAVE ANY QUESTIONS.

**MR. ROTOLO:**

DOCTOR, THAT'S ALL THE QUESTIONS I HAVE. YOU HAVE THE RIGHT TO READ AND SIGN YOUR DEPOSITION OR YOU CAN WAIVE THAT RIGHT, AS I'M SURE YOU KNOW. WHAT WOULD YOU LIKE TO DO?

**THE WITNESS:**

WAIVE.

**MR. ROTOLO:**

WAIVE THE RIGHT. THAT'S ALL I HAVE, SO WE'LL GO OFF THE RECORD. DOCTOR, I DO APPRECIATE YOUR TIME.

**(DEPOSITION CONCLUDED)**

# Exhibit D

21942



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

ORIGINAL

| | |
|---|---|
| In re: BAYCOL PRODUCTS LITIGATION<br><br>This Document Relates to:<br>JAMES THOMPSON<br><br>VS.<br><br>BAYER CORPORATION, ET AL | MDL No. 1431 (MJD)<br><br>CASE NO. 02-CV-00163 |

**DEPOSITION OF DR. FERNANDO ALEMANY**

The oral deposition of DR. FERNANDO ALEMANY was taken in the above-entitled cause, pursuant to the following stipulations, before Cheryl Venable, CCR, at the offices of Dr. Alemany, 3972 I-49 South Service Road, Opelousas, Louisiana, on the 16th day of January 2007, beginning at 4:35 p.m.

DR. FERNANDO ALEMANY

After having been first duly sworn was examined and did testify as follows:

EXAMINATION

BY MR. BLANCHARD:

Q Good afternoon, Doctor. My name is Chuck Blanchard. I represent Bayer Corporation in a lawsuit filed by Mr. James Thompson who is here proces today. I'm going to ask you some questions today concerning a report that you issued in connection with Mr. Thompson's case. As a preliminary matter, can you state your full name and address for the record, please?

A Fernando Alemany. It is 3972 I-49 South Service Road, Suite 200, Opelousas, Louisiana.

Q And how long have you been at this address, Doctor?

A Since October. Only about three months.

Q And where did you practice before then?

A Next door at 138 Lazaro Boulevard.

Q How long have you practiced in the Opelousas area?

A Seven years.

Q Doctor, you know that you have the right to read and sign your deposition. Do you want to waive that right or do you want to wait until the end to make that decision?

that were reviewed, but no other depositions of such.

Q So take me through the process that you went through with Mr. Wright. Did he ask you to review some cases to determine the type of injuries involved?

A Yeah. It started with a conversation with one of his legal -- I don't know what you call them. Assistant, legal --

Q Legal assistant or paralegal?

A Legal assistant or paralegal to my office, if I was willing to review some cases that involved rhabdomyolysis with the use of Baycol. And I had been referred by another internist. And I think at that time they gave me the name of the internist. I said, "No problem. I'll tell you what. I'll review them and I'll tell you." And all they wanted to know was was there rhabdomyolysis or not. I said, "That's probably all I can tell you, if there was rhabdomyolysis or not." And so I reviewed the bunch of charts and I said, "Yeah, well, everybody had myalgia," which is pain to the muscles. And I said of those there were only about two or three that I could say had rhabdomyolysis. Attributable or not to Baycol, I couldn't tell at

that moment. Actually most of them I couldn't tell. The only one I said I could probably say was probably Mr. Thompson.

Q So you said probably Mr. Thompson?

A Yes.

Q So as you sit here today, you're not absolutely sure of whether he had rhabdomyolysis as a result of Baycol use, are you?

A Well, as a result of Baycol I can't say. I do know that he did have rhabdomyolysis. Actually he's still having muscle breakdown. Is this something that was caused by Baycol or something that was caused by another condition? I can't tell right now. And the degree of rhabdomyolysis, again, there's no real definition of a level of rhabdomyolysis. Rhabdomyolysis by itself is muscle breakdown, the showing of the myoglobins, the muscle cells in the urine. Now, there are different degrees of rhabdomyolysis. There's fulminating rhabdomyolysis. You break so much muscle at once that you literally drown in the waste. That's fulminating. And there's rhabdomyolysis with chronic renal failure. You have enough breakdown that you clog the kidneys. Then you have the rhabdomyolysis that can be caused

by heat stroke. You know, it's pretty bad. It will give you some bad pain. And there's rhabdomyolysis caused by fever or trauma by a traffic accident. So there are different degrees of rhabdomyolysis.

Q Elevated triglyceride levels, would that also be a potential cause of rhabdomyolysis?

A That in certain cases can cause rhabdomyolysis.

Q So there are numerous potential causes of rhabdomyolysis?

A Numerous potential causes of rhabdomyolysis and numerous potential causes of the different degrees of rhabdomyolysis.

Q Right. And Mr. Thompson -- we'll go through that later, but he's been your patient for at least a couple of years?

A On and off, yes.

Q And you don't have any opinion as to what caused his rhabdomyolysis, do you?

A At the moment -- one second.

(DISCUSSION OFF THE RECORD)

MR. BLANCHARD: (CONTINUING)

Q Do you remember the question?

A Yes. If at the moment if I knew the cause of Mr. Thompson's rhabdomyolysis? That was the

question?
Q Right.
A At the beginning, I could have said, yeah, well, there may have been some association to Baycol. Right now he hasn't taken Baycol for I don't know how many years. So if he's still having rhabdomyolysis -- and I can't recall because I can't remember the last time I checked his CPK's. Well, I do recall right now it's almost a year ago, March of 2006 his CK total was normal. What I told Mr. Wright would make this case very difficult was the fact that, you know, at the moment that he was taking the Baycol and had the complaints, a CK level, a measurement of the enzymes that are a product of muscle breakdown should have been acquired. That would have helped us a lot. There's a chance it could have happened that he had destruction and the destruction slowly got better.
Q But as you sit here today, you can't give us an opinion that Baycol caused this man any injury, can you?
A I cannot say right now that Baycol was the injury factor in Mr. Thompson.
Q You can't say that Baycol caused him any injury, can you?

A I cannot say either way that Baycol did or did not.
Q Doctor, I'm going to go ahead and mark the notice of deposition here as Exhibit No. 1 and I'm going to go ahead and mark a subpoena that we issued to you as Exhibit No. 2.
(EXHIBIT 1 AND 2 IS MARKED FOR IDENTIFICATION)
MR. BLANCHARD: (CONTINUING)
Q And in connection with the subpoena that we served on you, we asked you for some documents concerning the case. I want to go over those with you and see if you have any documents responsive to the subpoena.
A Newer ones or older ones?
Q We'll go through them. The first item was your current curriculum vitae and a bibliography. Do you have a current CV, Doctor?
A I have a current CV I can make available to you, yes. You don't have it?
Q Well, Doctor, I will show you a CV that I have that is dated 2002.
A Oh, boy. It's been this long?
Q Yes. Do you have anything --
A I have an updated one.
Q Do you mind calling your secretary and getting one for us, please?

A Let me see. Yeah.

(DISCUSSION OFF THE RECORD)

MR. BLANCHARD: (CONTINUING)

Q All right, Doctor. While we're waiting for the CV, we'll go through the remainder of the requested items in the subpoena. Number two was the complete file maintained by you in connection with Mr. James Thompson. Do you have that with you here today?

A I have his file here, yes.

Q So you have a chart for him?

A Correct.

Q So he's actually been a patient of yours, correct?

A Yeah. He actually continued seeing me after I reviewed him, yes. He came back to me for follow-ups and treatment of his other problems.

Q So the first time he saw you was in connection with a request by Mr. Wright; is that correct?

A That's correct.

Q And then subsequent to that time, he continued to see you; is that correct?

A He came back to see me on a couple of times, yes.

Q And since that time, you've continued to be one of his treating doctors; is that correct?

A Apparently, yes.

Q And what's the nature of your practice, by the way,

prescribe Baycol?
A I probably have. I probably did. But I just can't remember it was so long ago, but I probably did.
Q So you don't recall any of your patients ever suffering from rhabdo from Baycol use, do you?
A No.
Q Have you ever submitted any adverse event reports concerning statin medications?
A No, not statins. I have not. Other drugs I have, but not statins.
Q And the patient that you had that you believe had statin induced rhabdo, you didn't submit an adverse event report on that one, did you?
A No. That was -- no. No. It wasn't that significant, number one. Number two, it is well documented that statins can cause rhabdo.
Q Doctor, in your patients that have myalgias from statin medications, has it been your experience that those muscle aches, the myalgia will go away once the statin medication is discontinued?
A It always has up to now.
Q And as far as your understanding of statin induced rhabdomyolysis, is it also your understanding that once you cease the statin medication, the CK levels will go down and the person will no longer have the

rhabdomyolysis; is that correct?
A Up to now, yes.
Q That has been your experience?
A Yes, sir.
Q And is that your understanding based on your review of journals as well?
A Yes, sir.
Q So if you had a patient that came in and was on a statin medication and reported to you myalgias, muscle aches, back pains and you took them off of the statin medications and they still continued to have those pains for months or years later, would it be your opinion then that the backaches and muscle pains were related to something else?
A I would try to look for a second etiology, yes, for a second reason.
Q Because your experience has been, again, that once you stop the statin medication, the myalgias would go away?
A Correct.
Q Doctor, I assume you've never been involved in any studies concerning Baycol, have you?
A No, I have not been involved with any Baycol studies.
Q Doctor, let's talk about myalgia in patients on

that chart.

Q We'll go ahead and if you can provide it to the court reporter, we'll attach it as Exhibit 4.

A It will be provided.

(EXHIBIT 4 IS MARKED FOR IDENTIFICATION)

MR. BLANCHARD: (CONTINUING)

Q Let's go over it, Doctor. And I apologize if I lean over you on occasions, but this is the first time I'm seeing some of this myself. So let's go over, Doctor, the first time that you saw Mr. Thompson. When was that, Doctor?

A June 25, 2003.

(DISCUSSION OFF THE RECORD)

MR. BLANCHARD: (CONTINUING)

Q All right, Doctor. Let's go through the first time that you saw Mr. Thompson.

A June 25th, 2003.

Q And, Doctor, can you go through your notes of that visit, Doctor?

A Yeah. That was a visit that I had of the first time I met him and he had come in to be evaluated because of his rhabdomyolysis. And he stated at that time that about 2001 he started taking the Baycol and about two or three months thereafter he started getting pains in his arms and legs. He

switched physicians. I think it was at that time he went to see Dr. St. Cyr and he was given some pain medication and continued taking the Baycol until the Baycol was taken off the market.

Q Do you remember when Baycol was taken off the market, Doctor? Do you know?

A No, I can't recall.

Q Well, it was withdrawn in August 2001. So when you saw him, this was about two years after withdrawal from the market, correct?

A That's correct.

Q And did Mr. Thompson tell you that he had rhabdomyolysis?

A Yeah. He came in with that, yes, with that diagnosis.

Q So he told you that by history basically? He told you that he had rhabdomyolysis?

A Well, either he told me -- yeah, he told me he had rhabdomyolysis. Yeah.

Q And did you independently determine whether or not he had rhabdomyolysis at that time?

A Well, when I saw him in 2003, no, I didn't. I didn't check him for rhabdomyolysis in 2003 when I first saw him. I checked for other things that could have been giving him his chronic aches and

pains. And I didn't have the reports and I requested them.
Q So when you first saw him, again in June of 2003, he told you that he had the rhabdo, correct?
A Yes.
Q And you told me earlier that if someone has an elevated CPK level, you would consider that to have rhabdo; is that correct?
A That is correct.
Q And am I correct that a CPK and a CK level are --
A They're the same, yeah.
Q Doctor, I don't believe that you had this information when you first saw Mr. Thompson or at any time. We have some records from Our Lady of Lourdes Regional Medical Center from August of 1996 when Mr. Thompson was admitted to the hospital at that time.
A Well, you know what? I got some here under correspondence. Maybe they're the same. I got some from 2001 from Dr. St. Cyr. And you got some from '96?
Q We've got some from '96 which is Bate stamped OLLH000012AT.
A You're right. I don't have those. I only have 2001 and above.

Q Now, at this time, Doctor, am I -- I'll represent to you, Doctor, at this time in 1996 Mr. Thompson was not on any statin medications.
A That is correct.
Q And he had an elevated CK level at that time?
A That is true.
Q So based on these readings at that time, based on your definition of rhabdomyolysis, Mr. Thompson had rhabdo at this time in August?
A In 1996 Mr. Thompson had muscle damage, rhabdomyolysis, according to my definition, yes.
Q And obviously if this was before he was taking any statin medications, the rhabdo could not have been caused by statin medication, could it?
A That's correct.
Q Now let's go back to your June 25th, 2003 examination of Mr. Thompson. He reported to you the rhabdo and he reported to you some muscle aches and pains. You tried to determine the cause of those muscle aches?
A Yes, I tried to determine the cause of those.
Q And what sort of tests did you run, Doctor?
A Well, I was looking for other causes that cause -- other conditions that cause myalgia and chronic pain.

Q What sort of tests did you run?
A I checked for common viruses that does that. Like I said, I deal in viruses a lot and there are two viruses that cause chronic fatigue and chronic myalgia. One is the Epstein Barr virus, mononucleosis, and the other one is Herpes Virus Type 6.
Q Did Mr. Thompson have either one of those?
A Both of them.
Q He had both?
A Yeah.
Q So he tested positive for Epstein Barr and what was the other one, Doctor?
A HHV6, Hepatitis Herpes Virus Type 6.
Q Can you point me to that lab report, Doctor, where he tested positive for those? And this is a report dated June 28?
A June 26.
Q Oh, I'm sorry. June 26th. It was reported on June 28th. And he tested positive for both of those that you just mentioned, correct?
A Yes, sir.
Q And, Doctor, in your opinion, those conditions that he tested positive for, could those be a cause of the muscle aches and pains that he was reporting to

you?
A Yes, they can.
Q Was it your opinion that that was the cause of his muscle aches and pains at that time?
A Probably did. In light of that 1996 elevated liver function test and CPK, yes.
Q So at the time that you saw him on June 25th, 2003, your diagnosis of him would be that the muscle aches and pains was more likely than not related to the Epstein Barr virus and the other virus that you mentioned; is that correct?
A That is correct.
Q And you had no evidence at that time that Mr. Thompson's continuing muscle aches and pains were related to Baycol?
A No.
Q In fact, you don't have any evidence in your record at that time that he was having any problems as a result of Baycol, do you?
A No.
Q And it's your experience that if he had any problems as a result Baycol, if he would have been off of the medication for almost two years, his continuing muscle aches and pains would not be related to Baycol; is that correct?

A That is correct.
Q Let's move forward, Doctor, to the next time that you saw Mr. Thompson. When was that?
A July 3.
Q July 3 of 2003?
A 2003.
Q Doctor, I want to go back to these tests from 1996. We talked about the elevated CK. There were also other elevated liver tests, the AST and the ALT?
A Right.
Q And can you describe for me what that means, what these tests are for and what they signify?
A They signify the liver is being attacked or inflamed by something.
Q And I want to draw your attention, Doctor, also there's an alcohol serum level of 107.
A That could have been why his level was high. This could have been as a result of a traffic accident or this could have been a result of something else. It's an emergency room measurements, though. He may have been involved in an MVA.
Q Alcoholism, could that be a cause of these elevated liver function tests, Doctor?
A Yes, sir.
Q Let's move forward to July 3rd, 2003, Doctor. Can

you go over your notes of that visit?
A Yeah. He had an elevated liver function test. I think he was still taking a statin call Zocor, so I told him to stop.
Q So at that time, he reported to you that he was on Zocor. Did he tell you who was prescribing the Zocor for him?
A No. I can't recall asking him or anything like that, no.
Q So he reported to you that he was on the Zocor and you told him to get off of the Zocor?
A Yes, sir.
Q Can you go over the rest of your notes from that visit, Doctor?
A I gave him some Coreg for his blood pressure. I told him about the HHV6, Herpes Virus Type 6, and I recommended physical therapy for his aches and pains.
Q As of this time, July 3rd, 2003, the cause of his muscle aches and pains, again, your belief was that it was related to his positive virus test; is that correct?
A Probably, yes.
Q Now let's move forward, Doctor. When was the next time that you saw him?

A July 23rd, 2003.
Q Can you go over your notes of that visit, Doctor?
A My initial exam was normal. I told him all of the other tests were negative. I said we'll try something called deep tissue massage, which is an ultrasound way of trying to relax big muscle groups.
Q All right. And did your opinion of the cause of his muscle aches and pains change at all at that time, July 23rd, 2003?
A Yeah, I'm still looking for other sources, but no, my opinion had not changed.
Q All right, Doctor. When was the next time that you saw him after that?
A August 5, 2003.
Q Please go over your notes from that visit, Doctor.
A At that time he said he was not sleeping well, very depressed, was not taking his blood pressure medication. He was taking a muscle relaxant. He had been on Effexor, which is a depression medication, for over a year. So I stopped it and -- actually I added Wellbutrin to it, which is another antidepressant that works great in combination with Effexor. And I told him, you know, blood pressure control is very necessary.

received in connection with Mr. Thompson's case from his lawyer at that time, which was Bob Wright. We'll go ahead and mark this as Exhibit Number 5.

(EXHIBIT 5 IS MARKED FOR IDENTIFICATION)

MR. BLANCHARD: (CONTINUING)

Q Doctor, do you recognize this document?

A Yes. I recognize the handwriting, too.

Q Is that your handwriting on the document?

A Yeah, that is my handwriting.

Q And is that your signature on page --

A That is my signature on the second page of the document.

Q And, Doctor, going through this case specific expert report, under number four you note that you reviewed medical records of the above patient. And there's a list of medical records attached to that.

A There's a list of medical persons and institutions attached to this.

Q It says Medical Records Reviewed by Dr. Alemany, James Thompson. Do you see that?

A Yeah.

Q Do you recall reviewing those documents?

A No, I don't.

Q So you didn't prepare this sheet that says Medical Records Reviewed By Dr. Alemany?

A No, I didn't prepare this sheet.
Q And you didn't review any of these documents, did you?
A No. Other than the ones that I showed you today in my chart, no.
Q So the Our Lady of Lourdes Hospital records, I showed you a lab report on that. You hadn't seen that obviously before today, had you?
A No. All I have is what I have in my chart.
Q So to the extent that this sheet says that you reviewed these medical records, Our Lady of Lourdes Hospital, Doctors' Hospital, Acadian Medical Labs, if it's not in your chart, that's incorrect?
A Well, I do have Acadiana Medical Labs, but from 2001 on, the middle of 2001 on. I do have office notes from -- I have no idea who this is. It could be Dr. St. Cyr. From September of 2001. I have a radiology report from St. Mary, Our Lady of Lourdes Imaging. This is from 2002. So I did review charts from some of these people. I don't have anything from Dr. Daigle, for example.
Q And Horsemans Benevolent, Drs. Lazaro and Porubsky?
A No.
Q Dr. Jeffrey Chen?
A No. Lafayette General Medical, no.

Q So regardless of what this says, this document says that was attached to your report which is Bates stamped SPF2000005, the only records that you reviewed in connection with Mr. Thompson are the records that are in your chart?
A That is correct.
Q Doctor, in going over this report, it's dated June 2004. We talked earlier and under number four there's a note, "I reviewed the following medical records of above patient. My opinion is based on my review of these records. Check here if applicable. My opinion is based on my examination of the patient. I understand that there are other records for this patient beyond those which I have reviewed." And there's a note there myalgia and rhabdomyolysis, correct?
A That is correct.
Q Now, doctor, we've established earlier that based on your continuing treatment of Mr. Thompson and the fact that he still has these muscle aches and pains, that he had the other viruses that we've talked about, based on everything that you know now, you can't say for sure that Baycol caused him any injury, can you?
A No, I cannot say that.

Q So this report, when there's a note, number five, it is my opinion that this patient has suffered injuries or damages relate to this patient's ingestion of Baycol, these injuries include the following, myalgia and rhabdomyolysis, based on what you know now, you can't say that, can you?
A Correct.
Q So as we sit here today, this report that says that Baycol caused Mr. Thompson these injuries, again, as we sit here today, you cannot give that opinion in this case, can you?
A No.
Q And you can't give any opinions in this case that Baycol caused Mr. Thompson any injury at any time, can you?
A Not with the information that I have right now, no.
Q Let's go over the visit, Doctor, in March of 2006. Can you go over your notes from that visit, Doctor?
A Yeah. I noted that I had seen him after about three years without seeing him. I had seen him first because of a suit against Baycol. He's still having a lot of muscle pain and he was seeing pain management in Lafayette. He was still having a lot of pain. There was a medication that had come out which is an antidepressant called Cymbalta. I said